UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

| | |
|---|---|
| PATRICIA LOMBARDO, | Case No. 2:17-CV-2242 JCM (PAL) |
| Plaintiff(s), | ORDER |
| v. | |
| PROPERTY AND CASUALTY INSURANCE COMPANY OF HARTFORD, et al., | |
| Defendant(s). | |

Presently before the court is defendant Property and Casualty Insurance Company of Hartford's ("defendant") motion for summary judgment. (ECF No. 41). Plaintiff Patricia Lombardo ("plaintiff") filed a response (ECF No. 48), to which defendant replied (ECF No. 50).

Also before the court is defendant's motion to preclude testimony of retained expert. (ECF No. 42). Plaintiff filed a response (ECF No. 43), to which defendant replied (ECF No. 47).

**I.    Background**

The instant action arises from a homeowner's dispute with her insurance company after her roof was damaged in a windstorm. In October 2013, a windstorm toppled a tree in plaintiff's backyard. (ECF No. 41 at 4). The tree struck plaintiff's roof and damaged it. *Id.* Defendant inspected the damage and instructed plaintiff to hire a tree removal service and put a tarp on the roof to avoid further damage. *Id.* Defendant told plaintiff "that roof damage would be covered along with the reasonable expense necessary to tarp the roof." *Id.*

Plaintiff did not have the tree removed until early December. *Id.* Plaintiff did not tarp the roof. *Id.* Instead, defendant hired an independent contractor to tarp the roof in mid-December. *Id.* The contractor tarped the roof and, in doing so, nailed the tarp onto the roof. (ECF No. 48 at

4–5). In mid-December, plaintiff noticed a drip from the ceiling (ECF No. 41 at 6) and "expressed concern to [defendant] that [the contractor] had damaged her roof and had caused water damage to the interior of the home." (ECF No. 48 at 5).

In February 2014, plaintiff suggested there could be mold in the home. (ECF No. 41 at 6). Defendant inspected the home, found water damage, and recommended a company to remediate the mold. *Id.* Plaintiff did not remediate the mold. *Id.*

As a result of the damage caused by the trees and nails, defendant concluded that it would replace the roof. (ECF No. 41 at 4–5). Given the type of roof on plaintiff's home, replacing the roof would also replace the ceiling, addressing the interior water damage in the process. *Id.* In April 2014, defendant paid plaintiff $34,308.13 to replace her roof and reimbursed her $2,500 deductible. *Id.* at 5. Although plaintiff cashed the check, she did not replace her roof. *Id.* at 6.

In October 2014, defendant coordinated another inspection and mold remediation. *Id.* at 7. Plaintiff's son objected to the engineer defendant had hired to inspect the roof, and plaintiff declined when the contractor reached out to her about remediation. *Id.* In December 2014, plaintiff moved into a rental home due to the mold. *Id.* Although defendant contacted plaintiff "about its concerns about the lack of cooperation in the claim investigation and resolution," defendant began making "alternative living expense" ("ALE") payments to plaintiff. *Id.*

In March 2015, plaintiff's son told defendant that he had found a company "to do all the repairs, provide a diagnostic on the roof, and opine as to what caused the interior water damage." *Id.* The ALE payments were set to expire in June 2015, so defendant asked plaintiff to submit estimates for the work. *Id.* Plaintiff's son did not submit the requested documentation in time, but defendant extended ALE payments regardless. *Id.*

Finally, in July 2015, plaintiff's son provided defendant with his documentation. *Id.* at 8. The documentation did not provide repair estimates or diagnostics. *Id.* Instead, an architect at "IZ Design Studio" recommended demolishing and rebuilding the home without opining as to the cause or age of any water damage or mold. *Id.* Defendant investigated this new claim but, because plaintiff was "frequently unresponsive to emails and phone calls," it could not reinspect the house until October. *Id.* All the while, defendant continued to make ALE payments. *Id.*

**James C. Mahan**
**U.S. District Judge**

In October, defendant hired an environmental firm, a remediation company, a construction company, a structural engineer, and a consulting firm to inspect the home. *Id.* Defendant received an estimate for covered repairs, which totaled $64,520.69. *Id.* at 9. In addition to the prior $38,115.99 payment to replace the roof, defendant paid plaintiff $2,959.24 for mold remediation and $23,445.46 for interior repairs. *Id.* at 9 n.7. Pursuant to the policy terms, defendant informed plaintiff that it would pay her an additional $7,815.15 of retained depreciation once the repairs were complete. *Id.* at 9.

Plaintiff did not complete the repairs. *Id.* Instead, plaintiff's son sent defendant a one-page estimate of $1,018,740 to demolish and rebuild the home. *Id.* Defendant rejected the estimate because, according to its experts and inspections, the home could be cleaned and repaired. *Id.* at 10.

After two and a half years, defendant ceased making ALE payments in June 2017. *Id.* Plaintiff retained counsel and filed suit. *Id.*

## II. Legal Standard

The Federal Rules of Civil Procedure allow summary judgment when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that "there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). A principal purpose of summary judgment is "to isolate and dispose of factually unsupported claims." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986).

For purposes of summary judgment, disputed factual issues should be construed in favor of the non-moving party. *Lujan v. Nat'l Wildlife Fed.*, 497 U.S. 871, 888 (1990). However, to be entitled to a denial of summary judgment, the nonmoving party must "set forth specific facts showing that there is a genuine issue for trial." *Id.*

In determining summary judgment, a court applies a burden-shifting analysis. The moving party must first satisfy its initial burden. "When the party moving for summary judgment would bear the burden of proof at trial, it must come forward with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial. In such a case, the moving party has

the initial burden of establishing the absence of a genuine issue of fact on each issue material to its case." *C.A.R. Transp. Brokerage Co. v. Darden Rests., Inc.*, 213 F.3d 474, 480 (9th Cir. 2000) (citations omitted).

By contrast, when the nonmoving party bears the burden of proving the claim or defense, the moving party can meet its burden in two ways: (1) by presenting evidence to negate an essential element of the non-moving party's case; or (2) by demonstrating that the nonmoving party failed to make a showing sufficient to establish an element essential to that party's case on which that party will bear the burden of proof at trial. *See Celotex Corp.*, 477 U.S. at 323–24. If the moving party fails to meet its initial burden, summary judgment must be denied and the court need not consider the nonmoving party's evidence. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 159–60 (1970).

If the moving party satisfies its initial burden, the burden then shifts to the opposing party to establish that a genuine issue of material fact exists. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). To establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor. It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 631 (9th Cir. 1987).

In other words, the nonmoving party cannot avoid summary judgment by relying solely on conclusory allegations that are unsupported by factual data. *See Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989). Instead, the opposition must go beyond the assertions and allegations of the pleadings and set forth specific facts by producing competent evidence that shows a genuine issue for trial. *See Celotex*, 477 U.S. at 324.

At summary judgment, a court's function is not to weigh the evidence and determine the truth, but to determine whether there is a genuine issue for trial. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). The evidence of the nonmovant is "to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255. But if the evidence of the

nonmoving party is merely colorable or is not significantly probative, summary judgment may be granted. *See id.* at 249–50.

**III. Discussion**

As an initial matter, plaintiff abandoned her breach of fiduciary duty and intentional infliction of emotional distress claims. (ECF No. 48 at 13). Thus, the only claims remaining are for breach of contract, breach of the implied covenant of good faith and fair dealing, and bad faith.

"A breach of contract may be said to be a material failure of performance of a duty arising under or imposed by agreement." *Bernard v. Rockhill Dev. Co.*, 734 P.2d 1238, 1240 (Nev. 1987) (citation omitted). "Nevada law requires the plaintiff in a breach of contract action to show (1) the existence of a valid contract, (2) a breach by the defendant, and (3) damage as a result of the breach." *Saini v. Int'l Game Tech.*, 434 F. Supp. 2d 913, 919–20 (D. Nev. 2006) (citing *Richardson v. Jones,* 1 Nev. 405, 405 (Nev. 1865)).

"An implied covenant of good faith and fair dealing exists in every Nevada contract and essentially forbids arbitrary, unfair acts by one party that disadvantage the other." *Frantz v. Johnson*, 999 P.2d 351, 358 n.4 (Nev. 2000)

> With respect to the covenant of good faith and fair dealing, [the Nevada Supreme Court] ha[s] stated that "when one party performs a contract in a manner that is unfaithful to the purpose of the contract and the justified expectations of the other party are thus denied, damages may be awarded against the party who does not act in good faith."

*Perry v. Jordan*, 900 P.2d 335, 338 (Nev. 1995) (quoting *Hilton Hotels v. Butch Lewis Prods.*, 808 P.2d 919, 923 (Nev. 1991)) (alteration omitted).

Finally, bad faith requires the "unreasonable denial or delay in payment of a valid claim." *Guar. Nat. Ins. Co. v. Potter*, 912 P.2d 267, 272 (Nev. 1996). "Bad faith involves an actual or implied awareness of the absence of a reasonable basis for denying benefits of the policy." *Am. Excess Ins. Co. v. MGM Grand Hotels, Inc.*, 729 P.2d 1352, 1354–55 (Nev. 1986) (citation omitted). Thus, a plaintiff must show that (1) the insurer denied or refused to pay the insured's claim, (2) that it objectively acted "unreasonably" in doing so, and (3) it acted "with knowledge that there is no reasonable basis for its conduct." *Potter*, 912 P.2d at 272.

Defendant addresses the breach of contract and breach of the implied covenant of good faith and fair dealing claims simultaneously. (ECF No. 41 at 12 n.11). Plaintiff's response groups her breach of the implied covenant of good faith and fair dealing claim with her insurance bad faith claim. (ECF No. 48 at 13–19). Accordingly, the court addresses all three claims together.

Here, because of the overlap between all three claims, if defendant discharged its contractual obligations, then the remaining claims fail. It is undisputed that the tree damaged plaintiff's roof. It is also undisputed that defendant paid plaintiff to replace the roof. However, plaintiff contends that "[t]here is no question that [defendant] owes further benefits to [plaintiff] under her homeowner's policy for the repair and/or replacement of her home." (ECF No. 48 at 9). Thus, the only issue before the court is whether, under the circumstances, defendant is contractually obligated to pay plaintiff to raze and rebuild her home.[1]

Plaintiff argues that "there is a robust factual dispute as to what caused the problems in [plaintiff's] home." (ECF No. 48 at 9). But plaintiff indicated to defendant that the water damage predated either the October windstorm or the tarp. (ECF No. 41-3 at 20). A claims adjustor noted that, while speaking to plaintiff, "[s]he continuously said that the interior water damage was always there but that she couldn't show the interior to anyone that came out from [defendant] or [contractor]." *Id.*

Indeed, Defendant inspected the premises, along with a general contractor and remediator, and reviewed photos from a November 2013 inspection that showed pre-existing damage to ceiling in the garage and living room. (ECF No. 41 at 6). Thus, "any interior damage appeared to be old and unrelated to the tree damage or the roof tarping nails." *Id.* The environmental expert noted that "[t]here were water stains on the great room ceiling, but not at the family room ceiling, indicating that the fasteners that were driven through the roofing are not the initial cause of the

---

[1] Throughout her reply, plaintiff argues that defendant's failure to pay her for a separate insurance claim regarding items stolen from her home while she lived in temporary housing supports her claims. (*See generally* ECF No. 48). But plaintiff did not allege the theft claims in her complaint and has not, until now, argued that the theft claims are part of this litigation. (*See* ECF No. 1-1 at 9–27). Defendants argue that plaintiff "may not rely upon that claim for the first time at the summary judgment stage." (ECF No. 50 at 7 (citing Fed. R. Civ. P. 37(c)(1))). The court agrees. Accordingly, the court disregards plaintiff's arguments regarding the alleged theft claims for the purposes of this motion.

James C. Mahan
U.S. District Judge

water staining in the great room." (ECF No. 41-3 at 104). Aerial photographs indicate that, because the roof was not timely repaired or replaced, the shingles on the roof were displaced over time. (ECF No. 41-3 at 104). Thus, "[w]ater stains were found on the garage ceiling **due to the displaced roofing**." *Id.* (emphasis added).

The parties do not dispute that there was mold in the hall bathroom, kitchen storage area, laundry room, and hallway of the home. (ECF No. 41 at 8). Indeed, an independent company "concluded that there was a possible drain leak in the wall." *Id.* at 6. Two other companies similarly concluded that "the mold in the bathroom likely came from a pipe leak, as there was no sign of water damage above the mold, only on the lower walls near the plumbing fixutres." *Id.* The environmental expert concluded that "[t]he mold and wall damages in the bathroom are most likely due to a roof leak at the roof vent penetration or a leak in the sink plumbing." (ECF No. 41-3 at 105).

In sum, the environmental expert report notes that "[t]he tree damage along the eastern roof edge . . . was minimal, affecting only the eastern edge of the roof." (ECF No. 41-3 at 103–04). Regardless of the extent of the damage caused by the tree, defendant paid plaintiff the full amount to replace her roof.[2]

Indeed, defendant argues that plaintiff "has presented no evidence *whatsoever* that the house sustained *any* damage that [defendant] has not already paid for."[3] (ECF No. 50 at 1). The court agrees. Had plaintiff timely made repairs, the damage to her home would not have escalated. Defendant made prompt payments to plaintiff to replace her roof, remediate the mold, and was willing to investigate the source of the water damage. Plaintiff was contractually obligated to "[p]rotect the property from further damage" and "make reasonable and necessary repairs to protect the property." (ECF No. 41 at 14). Plaintiff elected not to make the necessary repairs.

---

[2] Pursuant to the terms of the insurance policy, defendant withheld the depreciation value of the roof. (ECF No. 48 at 9). The policy provides that plaintiff would be entitled to the depreciation value—$7,815.15—upon completion of the repairs. *Id.* Plaintiff never repaired her home.

[3] Plaintiff attempts to introduce evidence of defendant's settlement offer. (ECF No. 48 at 10). Evidence of settlement offers are "not admissible—on behalf of any party—either to prove or disprove the validity or amount of a disputed claim." Fed. R. Evid. 408. The court disregards this evidence as inadmissible pursuant to Fed. R. Evid. 408.

Even assuming that the holes in the roof securing the tarp caused water leakage, replacing the roof would have prevented any further damage from the elements. "[Defendant] recommended a company to remediate the mold; one [the remediation] was done, the source of the water (and mold) could be investigated further." *Id.* at 6. Defendant paid to have the mold remediated and told plaintiff that "the repairs needed to be completed; once the mold was remediated, the investigation would proceed with respect to the cause of the water." *Id.* at 7. Plaintiff did not remediate the mold, and she did not cooperate with defendant's attempts to do so. *Id.*

In sum, plaintiff has not provided the court with any evidence that defendant failed to perform under the insurance contract. Instead, plaintiff makes unsupported assertions that defendant owes more than what it has already paid. Such threadbare allegations are insufficient to survive a motion for summary judgment. Thus, there is not a genuine issue of material fact on plaintiff's breach of contract claim. Because defendant did not breach the contract, is could not have violated the covenant of good faith and fair dealing and could not have acted in bad faith.

Defendant's motion for summary judgment is granted, and plaintiff's claims are dismissed.

**IV.    Conclusion**

Accordingly,

IT IS HEREBY ORDERED, ADJUDGED, and DECREED that defendant's motion for summary judgment (ECF No. 41) be, and the same hereby is, GRANTED.

IT IS FURTHER ORDERED that defendant's motion to preclude testimony of retained expert (ECF No. 42) be, and the same hereby is, DENIED as moot.

The clerk is instructed to enter judgment and close the case accordingly.

DATED November 25, 2019.

_____
UNITED STATES DISTRICT JUDGE